Our patent laws and the decisions of this Court reward inventors for what they have As this Court said this year in Ariadne, patent protection is limited to those who actually perform the difficult work of invention. CENTOCOR did not do the difficult work of inventing a fully human, high affinity, neutralizing antibody to TNS-alpha that competes with A2, the antibody that is the subject of the claims of the 775 patent. Instead, it was Abbott, our client, who invented the first fully human, neutralizing, high affinity antibody to TNS-alpha of any kind. In 1996, Abbott sought patent protection for that invention, the Patent Office granted patent protection in 2000, and in 2002, the Food and Drug Administration approved that product and it came to market. Now, in that same year, in 2002, the very same year that Humira came to market, CENTOCOR in its 13th patent application, and 8 years after the claim priority date, the claim priority date it now says enables and describes invention, sought the claims in issue. The claims in issue don't cover a chimeric antibody. They don't cover a murine antibody. They don't cover anything that's described by example in the patent. They cover only a fully human antibody. But because you marry... So, Mr. Lee, if you had to draft a specification with 775 to pass muster under written description at a bare minimum, you take the application that we have in the foreword, is it a bare minimum, what would you have to add? Your Honor, I think that what you'd have to add is what they added for A2 and CA2. They provided an amino acid sequence for A2 and CA2. You would have to add that at a bare minimum. Given where the technology was in 1994 or in 1991 when the application was originally filed, you wouldn't need that. Well, the case law hasn't said that has it. Actually, Your Honor... The case law hasn't demanded the recitation of a sequence. No, Your Honor. What the case law has demanded is a precise definition by structure, formula, chemical name, or physical properties. And let me break it into two parts to answer Your Honor's question. First, if this claim was simply a species claim to a single compound, Ariad says you need this precise definition. There is no definition at all. There's no definition at all in this case for one simple reason. They hadn't done it. You see claims two and three as genus claims, correct? They are genus claims, I think, Your Honor. Why? Your Honor, because they cover any fully human antibody that would bind a TNS alpha with a claim characteristic. High affinity, neutralizing, competitive with A2. And in fact, Your Honor, there are two facts that would demonstrate that that's correct and not just my view. The first is... I'm confused. Does it make a difference? As I understand Seneca, they see a genus in claim one. Well, Your Honor... They see two and three as dependent claims from that genus, a species. Your Honor, a species can be a subgenus. It still can have an enormous number of members of the genus. So if claim one claims chimeric and fully human antibodies, and claim two covers a subgenus, which is fully human antibodies, it's still an enormous number. And that's what Ariad, Feers, and Lilly tell us, I think, the answer to Your Honor's question. So the first is for the species itself, if there was only one precise definition, structure, formula, chemical name, physical properties, there is none. But there's a genus here in claim two, claim three, claim 13, claim 14. And for the genus, Ariad says, you have to have a representative number. And there isn't. Zero can't be a representative number. Or you have to identify the common structure. If we go immediately to... Let me go to the description issue, which Your Honor has directed us to. Those legal principles are clear. The undisputed facts in this case are there are no examples of a fully human antibody. There are no examples of how to make a fully human antibody. There is no description of the amino acid sequence... When you say no examples of how to make, I mean, you mean that there is no example demonstrating that the particular antibody was, in fact, made. I mean, there is certainly material in the specification that indicates how one would go about the process of making this antibody. You just object to the specificity of that material. Actually, Your Honor, let me break it down. I certainly object to specificity for written description purposes. Right. There's no indication that they provided the description that gives you, gives the public and one of ordinary skill in the art notice that they had possession of the invention. That's what Ariadne requires, both for the genus and the species. But actually, to go to the second part, I would respectfully suggest that there isn't, in the specification, sufficient description or disclosure to enable one of ordinary skill... Yeah, sure. That's your condition on enablement. Right. There isn't sufficient description to enable the production. But that's not to say that there isn't, in the specification, indications of directions to go, methods, technologies to use that would point you in the direction. The only question is how much of a leap between what's in the spec and what ultimately is obtained. That's correct, Your Honor. And let me break it down into the two different legal principles because I think the distinction is important. For the written description issue, a wish or a plan is not enough. Pointing someone in the right direction is not enough. For enablement, it's a slightly different analysis. But, Your Honor, let's focus on what Senate Court said to the jury on enablement. Their argument was, it's all out there. It's all out there in the inquiry. However, we disclosed a couple of things, 19 words in column 18 and affinity modulation in column 33. We disclosed a couple of things, and when you combine it with everything that's out there, that's enough. This court said in Genentech, the obligation of the patentee on enablement is to enable novel aspects of the invention. Particularly where you have disclaimed, as was true in Genentech, and as is true here where you've identified a problem that you're now purporting to solve. I'm sorry. Okay. The it's all out there isn't sufficient as a matter of law. And that's what this court said in Genentech. So I agree with the distinction Your Honor is drawing. I think there are two different analytical disciplines we have to engage in. With description, the area of requirement of structure, chemical properties, physical properties, a representative number is to communicate, I've got it. I've invented it. The chimeric antibody, the CA2, is adequately described, isn't it? The chimeric antibody is adequately described. And it's adequately enabled. It's adequately enabled. Right. And so in the process of manufacturing the CA2, you're going to have to get some humans into the variable region. Because it's a mixture of human and neuron, right? No. Your Honor, that's a place where I think the record is undisputed. And if I can go to that issue, the key area is the complementary determining region. It's referred to in the Lilly brief as the hypervariable region. Those are the keys. And both of us agree that those are the keys. They're different. I'm sorry. What I was trying to get at is it looked to me like the argument that your opposition is making is, look, we've described and enabled the CA2. And the CA2 is this blend of human and nonhuman in the variable region for the binding. And it's not a big deal. As a matter of science, it's not a big deal to go from there to the fully human antibody. And they say, you know, and the tools are here to do it. There are three answers to that, your Honor. The first is in the record. Is it a big step in science? Yes. It was a big step, your Honor. It's the reason that their witness described Humira as a dramatic innovation. And it was because there's not a progression between murine to chimeric to humanized to fully human. Fully human, as the record demonstrates, was the holy grail. It was, if you go back to the 91 application, your Honor, that they filed, they said a fully human antibody would be ideal. But you can't do it. So we're going to do the chimeric. They didn't know how to do it for this particular antigen. Well, they didn't know how to do it for this particular antigen. They didn't have perceptions. Hadn't they had a fully human antibody perception? Yep. But, your Honor, by 1994, they still didn't have it. And let me, to go to your Honor's question, your Honor. It doesn't really explain to me why. I mean, it looked to me like the big deal was to go to these people at CAP. That takes them about six months to be able to come up with a rudimentary totally human antibody, and then they have to tinker with it for a few months. Your Honor, there are three answers to your question. First is, in the record, at A579 to 580, and 2019 to 2020, you will find the amino acid sequence of the variable regions of CA2 and Humira. As the rolling brief demonstrates, those differ by more than 60%, and those are the key. The second thing, your Honor, is, with the disclosures that your Honor has just described, we didn't have the expertise to make a fully human antibody. The third thing, your Honor, is the undisputed record is not that someone just had six months and it popped out. You had the best scientists in the world working over a period of years, making innovations and inventions, innovations and inventions in phase display, guided selection, affinity modulation, all with the end result. They added, invented the first fully human antibody, got a patent on it, a patent that issued two years before these claims were ever filed. Now, to go to Judge Bryson's question, that recitation collapses a little bit the written description and enablement issues, right? But if you take this Court's decision in Ariadne and you take this Court's decision in Gidente, they both decide these issues as a matter of law. Ariadne, in fact, there was a jury verdict. There, in fact, was competing expertise. That's what I was going to get you to, backing away from the science and getting back to the law, because, as you well know, it's a question of fact. We've got a jury verdict here. We can assume the jury didn't credit Dr. Marks, your principal witness. So where are we left on the question of fact? Are we only to look at the four corners of the document and decide for ourselves? You and Judge Klobuchar were talking about whether it was a big step or not a big step. How are we supposed to, as a question of fact, evaluate a jury verdict? Your Honor, I think in the same way that the Court did in Ariadne, the same way the Court did in the NSK decision, which the Supreme Court did not assert on yesterday. It looked at the specification. It looked at the record. And what, in both cases, this Court looked at were the fundamentally undisputed facts. The fact of the matter is they didn't call an expert. But if you took Dr. Marks and we pretended or we assumed for a minute he had never testified, never testified at all, let's just assume that for a second, and we look at this patent and this specification and we're looking at what they claim to have done as of 1994, there is no disclosure that satisfies Ariadne, even if this were a species claim. Where is the written description of the precise definition of physical properties, chemical structure, or formula? There is none. For the genus, there certainly is none. For enablement, to go to Judge Bison's second question, on enablement, I don't think anybody disputes that the argument that it's all out there is not good enough before this Court. You have to enable the novel portions of your invention. And again, if you go to that issue, there's no dispute. You don't need Dr. Marks. And, Your Honor, here's the best indication that they haven't enabled the novel portions of their invention. What did they say? They said to the jury, and they said to you, it's all out there. Well, by saying it's all out there, they're saying to you, it's not in here. And if it's not in the specification, you haven't enabled it. Well, to be fair, my understanding of the context of that statement is that what they're saying is the technology is available. And we described the technology in the specification, and it is out there and, in that sense, available for ready implementation by persons of skill in the art. Now, I understand that you disagree with that, but isn't that in itself a question of fact? No, Your Honor. Okay. Let me interrupt you before you answer that just to make sure that part of it isn't said. We're going to not hold everybody strictly to the time limits here, so we'll make sure that we at least make an effort to try to keep the amount of time equal. So don't worry about time. The answer is no, Your Honor, and here's the reason why. Their argument has two components to it. The first part would actually fall within what Your Honor just described. In 1994, there was material added to the specifications. Dr. Marx's article, for one thing. Dr. Marx's article, a 1993 article in a peer-reviewed journal. Right. And then a mention of affinity modulations in column 33. But the argument was not that that was enough. There were five other references, none of which were identified in the specification at all, that were the basis for its enabling. And we cite those to the Court in our brief. But there were five other references, none of which were cited. So if you step back from this, Your Honor, and you think about the progression that's been presented to the Court, and Judge Posner, your question about what you can decide as a legal matter, here's the progression. The first stopping point is the fully characterized antigen of TNF-alpha was out there, and we identified the binding site. That's not enough. That's enough. But if that's not enough, then those two things, plus identifying Dr. Marx's article, plus referring to affinity modulation, is enough. But if that's not enough, there are these five other articles out there. Now, at the end of the day, it's critical to distinguish the two concepts. These other articles that were out there, or pointing in the right direction, if that's what they did, isn't sufficient for written description. But the jury didn't believe you. Right. Actually, Your Honor, that's no different than Ariadne. That's no different than Nintendo. That's no different than Congo. The opposition starts off with a presumption of validity, right? So this patent is presumed to be described and enabled. And, Your Honor— Your problem is to knock it down. You put Mr. Marx on the stand, right, and he's your guy. And if they don't believe Mr. Marx, then what's left of your case? Actually, Your Honor— You still have a verdict. Actually, Your Honor, we can sustain that burden, just as the defendant did in Ariadne, just as the defendant did in Nintendo, by pointing the court to the undisputed facts. That's why I think an answer to Judge Klobuchar's question— In enablement, there's undue experimentation. I think it's harder to get over that. The jury disbelieved Dr. Marx under cross-examination. I think on the question of undue experimentation, I see it as slightly different than the Ariadne model, which was exclusively on written description. Well, that's true. Ariadne and Nintendo are both on written description. And the answer to Judge Klobuchar's question is, it's the reason we have JML, it's the reason we have appeals, is to look at what is fundamentally the undisputed evidence. If we're going to just defer to any jury verdict—and I've been here before, both defending them and attacking them— But you've still got the problem on undue experimentation. You're a witness who says, well, these tools were out there, yes. But, Your Honor, Judge Post is correct. That has nothing to do with the written description. I'm still talking about it. Okay. And I think that Judge Post's statement is right. We have to distinguish between the two. You feel more—well, this may not be a fair question, but I'm not limited to fair questions. You seem to feel that you're on somewhat firmer ground with the written description with respect to this issue of the problem that the jury verdict presents you. Is that a fair characterization? Your Honor, if I were—I think it's a fair question and a question we've thought about. I think if I were to rank them, for Your Honor, under this Court's Ariadne decision, Nintendo, Tronzo, the easiest way to get at the jury verdict is written description because the standard is clear. The Rochester case says you can answer to Judge Clevenger's question on the basis of what's disclosed in the specification as a matter of law. Now, yet you like the Genentech case in the enablement case area because it is, in some respects, pretty close. The Genentech case is actually very close, Your Honor. And so if I were to say which is the most easily dealt with as a matter of law on undisputed facts, written description is it. Enablement, on the specific facts of this case, compared to the Genentech case, you get very close. And the reason is this. Genentech, you recall, was a preliminary injunction case, but the Court decided to address the question of the validity of the patent as a matter of law. So you did, while the procedural context is different, you do address it as a matter of law. And I think, Your Honor, there's— I'm having a hard time. You keep on saying they're underwritten description. They're undisputed facts. But written description is entirely a question of fact. We're here. We're disputing what the specification adequately describes it. So I don't see that there are undisputed facts. I think there's, to the extent written description is a question of fact, there's an entire actual dispute. Your Honor, I don't think there's any dispute on the following. There is no example of a fully human antibody disclosed. There is no—to go to Judge Bryson's question— there is no teaching as to how to make a fully human antibody with the claimed characteristics. There is no amino acid sequence or DNA sequencing coding to hypervariable or complementary determining region. There is no identification of the structure of that hypervariable region. There is no dispute as such. It's just like Ariadne and just like Sears and Lilly. And you can take that and then the question solely is this. If we believe, if we apply Ariadne's precise definition, chemical structure, formula, physical properties, what is there? And the answer is there is nothing. And the best indication of that, Your Honor, is what do they point to? They say to you the following. They say that disclosing the fully characterized antigen and the binding site is enough. That's wrong for five reasons. The first is they don't claim just one binding site, to go to Judge Cleventer's question. They claim multiple binding sites, an epitope or epitopes. So they're claiming a genus. The second is the disclosure at column 13 of the patent basically doesn't say here's the locking key. It says here's the general region. Five or more will do. If we're using the locking key analogy, this is closer to, well, here's the door. The lock's somewhere on there. And if you find the lock, maybe you can find the key. The third thing, Your Honor, is the case, if they were correct, if they were correct. The language in Noel, in the case that both parties seem to be dancing around and not actually fully embracing, is that the language there that if you have the antigen, that's the lock, you get the key? Well, let me address Noel and the PTO training materials at the same time. Because Noel's holding this. I'm sorry, go ahead. Well, I was just going to say, you know, saying that it's dictum may be true, but it isn't a terribly warm endorsement of a path for us to follow in designing the case. So any other help that you can give us with the Noel case would be welcome, other than to simply say, well, it's dictum. You can ignore it. No, I actually was going to move on from that. Okay. What I was going to say, Your Honor, is it's dictum, and the holding is that the disclosure of a murine antibody or antigen is not sufficient to disclose the human antibody. That's the holding. Now, the PTO guidelines for training materials in Noel collapse. So let me address both of them together. Because Noel is commenting upon what thinks he's in example 13. 16? It depends whether you're dealing with a 99 version or the later version. It's the same example. All right. So let's start with the guidelines, because Noel follows. Noel chronologically follows the guidelines. The PTO training materials don't apply for these reasons. First, the claim is different. If you look at the claim, it's any antigen that's capable of binding, any antibody capable of binding to the antigen. So it's a very different claim than the claim here that requires high affinity, neutralization, and competitive inhibition. The second is the time of the guidelines is 1999. That's when they were first promulgated, not 1994, when we're dealing with our claimed priority data. The third is the technology is different. The technology is a non-fully human murine hybridoma. It's a different area of technology. But the fourth and key distinction, because it goes to fears and lilies, is this. The words used in example 13 or 16 are routine, conventional. The presumption of the example is that there's a well-established correlation between function and structure. There is none here. So the time was different, the claim was different, the technology was different, and the presumption that there's a well-established correlation is different. Well, is what you are saying or suggesting that in some instances or perhaps many instances there is such a correlation that there just doesn't I'm talking about antigens and antibodies now, but there just doesn't happen to be here? Or are you saying that that's just wrong, grievously wrong as a matter of science, because with no antigen, is there a corresponding antibody? You can't simply look at the antigen and boom, you've got the antibody. To me, what you've just been saying is saying, well, maybe this is an effort to respond to my question about what beyond dictum you can say about the well, but it seems to me in your brief you were saying that that's just wrong as a matter of basic antibody science. Your Honor, I think these two things. We have cited to the court a law review article that came out shortly after the example 13 or 16, and it said it's just wrong as a matter of antibody science. Your Honor, that was written by Lilly's counsel and Lilly's and Amicus in this case. That's what my son likes to think. We're citing their Amicus brief, right? But in compliance with the court's rules, that was their Amicus brief, not ours. I understand. But, Your Honor, here's the best indication. In Noel, picking up on that, if you read the dicta that Seneca relies upon, it almost presumes that there's one antibody for one antigen. We know that's not true. No one contends that's true at all. So actually, Your Honor, we've talked about this question. Scientifically, do we think it's likely incorrect? Yes. If you build upon the example, though, and you take it into Noel, let me just say these things about Noel. First, again, the claim is different. The claim is just binds to the antigen, any antibody that binds to the antigen. It doesn't have any of the additional requirements we have here. But that presumably would be an even broader class, right? Right, Your Honor, but remember with the written description requirement there, if you apply the written description requirement and you have a broader class, but then you claim a narrower class, you're going to have to show that you have possession of the narrower class. If I invent the airplane and I describe in my specification the propeller airplane, but then I have a dependent claim that says I have the jet airplane and I assert the jet airplane against the subsequent inventor of the jet airplane, then I need a written description of that dependent claim, that subgenus, jet airplanes, in my specification. And in some ways, it's almost counterintuitive, but it's correct. If you're going to have additional requirements of high affinity, neutralizing, and competitive inhibition, you need to describe that because the fact of the matter is, Your Honor, the... Well, those are all the functional components, but there were some structural components in the specification as well, right? Not for fully human antibodies. Here's what Senate Court has done in its brief. Here's what Senate Court did in its brief, and here's what it did with the jury. In 1994, in two locations, it put the word human antibodies in. Chiron says that's not enough. That's like the perpetual time machine in Ariadne. It's like the automobile in the 19th century in Rochester. They then pointed to the jury and you and said, Oh, but see all of this over here about high affinity, neutralizing, competitive inhibition? That was all the chimeric antibody. They had no information about those properties for the fully human antibody. So to go back to Noel and finish, Your Honor, it's a different claim. It is, at the end of the day, the holding is one that we actually embrace. I think to the extent, and this is the best indication it is dicta, I think in some ways if you take what they're doing and taking the training materials and building it into a suggestion that there is an antibody for each antigen, we do know that is not true. Let me add just two other thoughts and then I'm well beyond my time and then I'll reserve whatever time you'll give me for rebuttal. One of the things, I want to go back to this question of whether disclosure of the fully characterized antigen in the binding site is enough, and to go back to the examples. Your Honor, in the examples, it is the patentee who is disclosing the fully characterized antigen and then making a claim based upon it. In this case, the fully characterized antigen was disclosed in 1984 by someone else. It was fully characterized in its crystal structure in 1989 by someone else. The binding site was in the prior. I follow through on the logic of Letterman that the keys belong to whoever invented the antigen. The antigen predates here. Right. But this is not a case where the patent suit invented the antigen. Your Honor, I think that there is no case that this Court has gone so far as to hold that if you fully characterize the antigen, you have the antibody. But if Your Honor is correct and you follow through with that logic, the claim is invalid. That's what I think. On your clients' too. I mean, all the antibody claims are invalid. Yes, that's exactly right. But there's something wrong with Noel against Letterman if you try to read it literally to say that if you have the antigen, you invent the antigen, and you know the binding site, then you're going to get all the antibodies. That's exactly right. And the difference in Noel is that the antigen in the Noel case was not a lightening contrast to TNF here, which you say was in the art long before that. Right. And the key difference between the statement in Noel and the PTO training materials are that they presume that it's the patentee who's disclosing this whole characterization and then claiming invention. This, as Judge Clement points out, is a situation in which it was out there for a decade. And after that decade, they're now claiming that that was enough to demonstrate they had possession of the invention. That was rendered the claim invalid. And I'll save the rest of my time for the following. Very well. Let's see. Mr. Williams, could you add, let me see. If you could add, why don't you say 20 minutes to Ms. Eldricken's time, and that'll probably bring us up to about parity, and we will reserve some time for Mr. Lee for rebuttal. Thank you. May it please the Court. The inventors of the 775 patent made a substantial and significant advancement in science. And the jury verdict, which rejected Abbott's position that the specification does not provide a written description or enablement, is correct and supported by substantial evidence. And this is not a case where the invention is trying to preempt all TNF antibodies. This is really a narrow invention. There were three witnesses at trial. Dr. Graham, Santa Cruz inventor, Dr. Salfeld, one of Abbott's inventors, and Dr. Marks, their experts, have all testified that what's critical is to find an antibody that binds to TNF in the right place to make the TNF stop working, to neutralize it. Now, anti-TNF antibodies were known. Human anti-TNF antibodies were known. Dr. Marks, their expert, had made one in the early 90s. And we don't have, there's no obvious challenge to these claims before us. Because what was invented here was the specific class of antibody. When you say human TNF-alpha antibodies were known, not with the high affinity and... Exactly. Not until these inventors made their invention was it known how to make these anti-TNF antibodies work. These are the inventors who discovered that if the antibody binds to TNF in the right place, so that it competes with A2, it works. But how does it bind it in the right place? Because they identified the human variable region. Where is that in the patent? The right place on the TNF is identified in the patent as, in two ways, by the competition with A2. If an antibody competes with A2 for binding to TNF, that means they bind in the same or similar region. And that is one way of defining the structure. And the patent even talks about the particular amino acid residues on the TNF antigen, which are implicated in this. The patent discloses the regions of the TNF molecule where the A2 antibodies or A2-specific antibodies bind. So this is a narrow invention. And it has several flavors, as we know. The claim language is performing a written description task. Yes, yes, just as it would in a chemical compound claim. If I had a chemical compound claim to benzene with lots of substituents on it, that's defining the invention. And here the A2 specificity that's recited in the patent. I thought I heard you say that. It's the A2 specificity that's beginning to describe for you the human-human. That is describing the structure of the antibody. That's effectively a purely functional limitation, right? To say that it competes with A2 doesn't tell me anything about what its sequence is. It doesn't tell me about what its structure is. It doesn't tell me anything about where specifically it binds, where the epitope is, right? It just tells me something about its function. No, I would argue that it is a structural definition. Okay, how? Because we had witnesses at trial who talked about the lock-and-key analogy for antibodies and antigen interacting. The antigen is the lock. The antibody is the key. And Dr. Marks or Dr. Self had said if you know the lock, that helps you define the key. Well, what we have defined with these patents, what the patent defines here is the lock, is the keyhole. This is the keyhole so that you can turn the antibody, turn this TNF off and neutralize it. My analogy is that the keyhole is very large and the key is a little smaller. So just on the basis of the top competing with A2, the key is rattling around the lock. It isn't hitting the tumblers. You need to have more specificity, right? There's no evidence of that. The evidence of record is that A2-specific antibodies, and there are two of them that we know about, one is Abbott's Humira and one is Senecor's Remdekate, are very effective at turning off TNF. Now, there may be other antibodies as well, but there's no evidence on record that that is not a sufficient description. We had a long discussion with Mr. Lee about the Noel case and the whole, if you've got the antigen, then you've got the antibody notion. Your brief certainly mentions that concept, but then seems, this may not be a fair characterization, but seems certainly not to fully embrace it and perhaps even to walk away from it. You don't really believe that that's correct as a matter of science, do you? No, we're not walking away from it. We're being very careful not to characterize it as a holding because I know we might be in trouble up here. Let me sort of get to the chase here and setting aside holding and dictum and so forth. You don't believe that if you have the antigen, you've got the antibody, correct? Well, there could be many antibodies to an antigen. Which sort of answers the question, right? Because if you have many, you don't have any one. You have a category, and then we're into the problem of deciding how well you've defined the category. Right, and the particular category here are the antibodies that are A2-specific, that compete with A2. That's a sub-genus, a small category. So do you have a statement in Noel to the effect of if you've got the antigen, you have the antibody. Is this wrong? I do not, and there's no basis on this record to change that. For over a decade, the expectations of the industry have been based on the Patent Office written description guidelines and this Court's guidance in cases like Noel and Enzo. That's the expectation of the industry, and these are the experts at the Patent Office talking about the recognized correlation between structure and function of antibodies, and there's nothing on this record that would, in due respect, allow this Court to overturn that because there's nothing in this record. But don't you move your patent on anticipation if that's the case? Because TNF was known back in the 80s. I don't think you dispute Mr. Lee's statement in that regard. So if just knowing TNF, the antigen, gets you or is sufficient written description for the antibodies, then everybody's invention here is anticipated. But there is no... Am I wrong about that? I'm plotting that analysis? Yes, you are, Your Honor. The issue is not whether the TNF antigen was novel or not. There are many... It's a rationale. If the theory is that if you own the antigen, you own the antibodies, and the problem is that your client doesn't own the antigen, somebody else owns it, and so somebody else owns the antibodies. With all due respect, I don't believe that was the underlying basis for Noel, that Noel owns the antibodies. There's a sentence in Noel, and since we've been talking about it so much, let me just read it so it's on the floor. I believe this is the right sentence. If Noel had sufficiently described the human form of CD40CR antigen, he could have claimed its antibody by simply stating its binding affinity for the fully characterized antigen, which sounds pretty much like saying, it's my shorthand in some cumbersome fashion, if you've got the antigen, you've got the antibody, you can claim it. But, of course, the consequence of that position would be if somebody else has the antigen, they've got the antibody, and you don't. Let me put it this way. Do you agree with that sentence as a statement of science? Is that scientifically correct? I have no basis not to disagree with it, based on the record and based on what the experts at the patent office have said. You said not to disagree. You have no basis to disagree with it. Well, if that's true, then why doesn't possession of TNF-alpha give possession to the antibody or antibodies, all of the antibodies of TNF-alpha, under that sentence? Unless I'm misreading it, that seems to be what it's saying. I think that maybe we read that sentence differently. Okay, that's what I want from you. Tell me how you read it, and I'll see if that seems to be it. Sure. I respectfully disagree with Castle's representation of what the Noel holding was. I believe he said that the holding is a disclosure of the murine antigen was not a description of the human antibody to it. And that's not the issue. The issue in Noel was that they were trying to claim all antibodies to both human and murine antigens, the CD40, which would be analogous to the TNF that we have here. So that's the thing that the antibody is binding to. And they had disclosed the sequence of the murine, the mouse CD40. They had not disclosed the sequence of the human CD40. So it wasn't an issue about who owned it or who discovered CD40. The issue was, did you disclose the sequence of the antigen? Because, based on what the Patent Office has done in its guidelines, which this court has accepted in a number of cases, the issue is whether you have a fully characterized antigen. Not who owns it, but did you fully characterize it? And if you did, then according to the guidelines, you can claim antibodies based on their affinity, their binding affinity to that antigen. But Noel hadn't disclosed the human antigen sequence. Here, the sequence of- Which brings us to that sentence. Which brings us to that sentence. And your reading of that sentence that differs from the one that I suggested is exactly what? I want to make sure I have exactly what your view of that is. It's not that Noel didn't own or discover the human CD40 sequence. It's that they didn't disclose the sequence. Never mind what happened to Noel. This is, I think everybody agrees, this is a piece of dictum which isn't tied directly to the holding of that case. But what the court is saying there, as I understand it, is, again, if you've got the antigen, if you have sufficiently described the human form of the antigen, you can claim the antibody. Without more, presumably, at least there's- By its binding affinity to the antibody. And that's precisely what we've done here, except we've gone much farther than that. We have disclosed the human TNF structure. But you didn't invent the antibody. We invented a class of antibodies. No, you did invent the antigen. No, I didn't invent the antigen. And that is not the basis of the Noel decision. The basis of the Noel decision is that regardless of who invented CD40, maybe nobody invented it. It exists naturally. Did you characterize it? Is there a characterization of it, either in your patent or somewhere in the arts? You're saying the novelty of your invention is that you characterized the TNF? No, the novelty of our invention is all the things in the claims. But part of the written description of our invention, according to the guidelines, and again what this court has said, is if you have a fully characterized antigen, which we do here, TNF, you can claim antibodies to it based on their binding affinity to that antigen. Based on their binding affinity. What I was reading that language to mean is if you have something that binds, then you've got the antibody that you can fully claim. All you have to show is that it binds to the antigen. I understand binding affinity to mean that it binds to a certain extent. As in our claims, we require that the antibodies have a particular affinity. I think it's 1 times 10 to the 8, which is a way of measuring the strength of the bond to the antigen. Which is purely functional, correct? That particular part is functional, yes. So you've not described, you can't point us to any structure. You're just saying that there's sufficient description because we described the TNF, which was not novel, and then we listed assumptions. Under the PTO guidelines, that's all that would be required, but we do go farther than that. We go farther because we describe the antibodies as being A2 specific. And that is a structural definition of the antibodies. Well, let me ask, what else? Because we got into this discussion because for my purposes at page 44 in your brief, you're saying you're not relying on the structure of the antigen as the only evidence of compliance. So that's where I thought you were kind of walking, gently retreating from the no-out term. And you say, to the contrary, there are many facts which evidence the antigen exposure. So what's beyond the A2 specific? Well, the A2 specific... You're saying, so let's take off the playing field entirely the whole argument about knowing the specific characteristics of the antigen. Okay, take it off. One of the data points in the patent that showed you've described the fully human antibody. The fact that we are limiting ourselves and defining them as A2 specific, that these are antibodies that bind to TNF in the same way as A2, at the same or similar place as A2. And the patent defines where that is on the TNF molecule. It says these particular amino acid residues are implicated in this binding. And because of the known correlation between structure and function of antibodies and antigens on which the PTO guidelines are based, that is a structural definition. You have to be a little more specific with this second point, the known correlation. Well, again, the PTO guidelines are... to have an actual amino acid structure for an antibody to get a claim to it. They recognize that there's a known correlation between the way antibodies and antigens bind and the function of the antibody to put the... Wasn't that the problem here? Nobody actually knew that very information was referred to an entirely human antibody? Not at all. Again, the key here is that by finding this particular class of antibodies that are A2 specific, defined like A2, unlike all the other TNF antibodies that might be out there that aren't effective in neutralizing TNF, like Dr. Marks' antibody, the ones that are specific to A2 turn off or neutralize TNF. And that is a structural description because it's a lock-and-key analogy that Abbott's Witnesses use in describing antibodies and antigens. I suppose, well, you may disagree, but I'll put this proposition out on the floor for you, that it is, at the time that the 94 application was filed, it was entirely possible that no one would ever find a fully humanized antibody that competitively bound A2 at the 10 to the 8th liters per mole affinity level, correct? It's entirely possible that nobody would ever find one? A, that no one would ever find one, and B, that there isn't one, right? I mean, there's no way you can tell me that there, I take it, that there was definitely one out there or more, but this was the best we could do to describe it, right? No, the patent, and it's been established, again, through the evidence of what, of Abbott's own infringing antibodies, that a human antibody... Well, we know now, but in 1994, could you have been, if we were standing here having this conversation in 1994, would you be able to tell me with dead certainty that there is an antibody that satisfies the requirements of Claims 2 and 3? Yes, and Dr. Graham explained that you could do that. How would you know that? It was already there, that's the question. How would you know? It was not already there, no, but Dr. Graham explained that if you find antibodies that bind the same way as A2, if you can, when you make one, and you... If you make one, though, right? Right. You might be able to make one. You might be able to make one. You would know it when you found it, but the question is, would you find it, and if you didn't find it, is it because it's not out there? I mean, what is it about... Well, that logic goes to the ultimate conclusion that you can't possibly claim anything until you've actually made it, which is contradictory to decades of this Court's jurisprudence. It's contrary to decades of this Court's jurisprudence that you don't need to have an actual example. Well, I'm not leaping to that. I just want to know, before we get to that question, whether there's anything that you can point to that would satisfy me that, yes, the 1994 application tells us that there is such an animal. We just can't give it. We can't describe it with any more specificity. In other words, if I make something in the lab, silly putty or something, whatever, something that he makes by accident, I know how I made it, but I have absolutely no idea what the structure is, but I've got it, and so I know it exists, and I characterize it by function and smell and a few other things, a pretty cumbersome characterization, but I put it in a patent application because I don't want to wait to get the thing sorted out chemically. I'm fine. Now, the question is, is this that case? Did you know that there was such an antibody, or were you saying, if anybody comes up with this antibody, we get it? The invention here was the specific class of antibodies that bind to TNF-like A2. And did you demonstrate that there was at least one member, not that you'd made it, but that there was at least one member of that class out there? In the chimeric antibodies? No, no, in the human antibodies. There was not a specific example. No, there was not a specific example. But again, that's not required by this court's jurisprudence. And Mr. Green has argued that the only way this could have been a satisfying, the specification could have satisfied the written description is to have an actual example, amino acid sequence by amino acid sequence of antibody. And again, that is contrary to what this court has said in other antibody cases. It's contrary to the statement in Noel. It's contrary to the PTO guidelines. And there is nothing in this record to support the necessity for that. To come back to your brief, when I started in 44 to 45, where you said you're not relying exclusively on the existence of the antigen, you said there are many facts that evidence the antigen disclosure. I got one on the list, the A2 argument. Right. Well, there are also functional attributes of the antibodies that are described and listed in the claims. The fact that it binds to a neutralizing epitope. The fact that it has particular affinity. The fact that the constant region of the human antibody, its sequence is provided. Anything else? Those are the things that come to my mind. I mean, in the patent, the judge may know the fact that, you know, you added the word human antibodies at one place and added human in another place, adding those words. Right. Aren't those words significant? Well, certainly the words are significant. We recognize that the words alone may not be sufficient, but certainly the fact that human antibodies are called out as one of the antibodies, one of the classes of antibodies in the agent is significant. For example, if I rejected your A2 argument and your functional attributes argument, then you wouldn't have a written description. It doesn't matter at all, right? I'm sorry, could you say that again? What I'm trying to get at is that the application got decorated in 94. There had been some decoration. There had been a couple of references of human, human, human in the 92 application. So you've got sort of a decoration aspect, and what I'm trying to do is to decide whether if your argument that you're making is saying that the A2 and the functional attributes are actually helping to describe the invention, as opposed to just being over here, what's left? Well, what's left then are these references of human in the two or three places in the pattern. What happens to your case if I don't buy your argument that the A2 and the functional attributes are helping to describe the invention? Isn't your application too thin then? Again, not according to the Patent Office guidelines and what was said in Noel, because there's a fully characterized antigen, TNF, and the claim recites antibodies. You only get the benefit of that rule if you own the antigen. Again, I respectfully disagree with that position. It's not about owning the antigen. It's about whether the antigen has been fully characterized, whether you own it or not. But it had been fully characterized. In our case, TNF. By somebody else. Right, by somebody else. Which is not relevant. The rule of law that you're suggesting, though, by saying under Noel that would be sufficient, would seem to me to be self-defeating. Well, if we were just claiming antibodies to TNF, that might be self-defeating, but we're not claiming just antibodies to TNF. We're claiming a very narrow class of antibodies that have at least a human constant region, human variable region, that are A2 specific, that bind to neutralizing epitope, and that have a particular affinity. So we're not claiming, trying to preempt the whole field of anti-TNF antibodies. We're claiming this very narrow class. And this is not like Ariadne, where they just said, hey, go out and find a compound that will inhibit NF-kappa B. Our inventors told you these are the antibodies that are going to neutralize TNF, the ones that bind the same way as A2, that compete with A2. So this was a contribution to science, and the claims are commensurate in scope with the contribution that these inventors made. Well, it seems to me that competing with A2 is just really another way of saying, well, we don't know what out there is going to work, but we do know that A2 works, and therefore, if this competes with A2, then it has the same functionality as A2. And it seems to me that the affinity is just a way of picking a number and saying we'd really like to have affinity that's high enough to be therapeutic, and 10 to the 8th liters per mole sounds like, from everything we know, a pretty good affinity. But those are just ways of saying, it seems to me, correct me if this is wrong, just ways of saying we're not going to ask for all of the antigens, we're just going to ask for the ones that we know will work, but then describing them in a functional way. Well, I would agree that the affinity might be functional, but the A2 specificity is not functional because it's a description of the structure because we know that there's a correlation between the structure of the antibody and the antigen. It's the lock and key analogy. We now know where on TNF this antibody has to bind to be effective, to be neutralizing, and we're only claiming the antibodies that bind to that same or similar region. And there's nothing in this record to suggest that there are A2 specific antibodies that don't work. To the contrary, the evidence of the record is that the two A2 specific antibodies that have been manufactured are wildly successful drugs that have changed the lives of thousands of people. I'm not suggesting that there were some A2 specific antibodies that didn't work. The mice have told us that A2 is a very effective sort of antibody, so why not copy the mice? And your claim says it has to compete with A2, which is to say that we know that that is going to work. There may be others that work, but you're taking your chances out there in the wilderness of all the other potential evidence, right? Right. And there are many TNF antibody patents out there. Ours is not the only one, I assure you. But we're not trying to claim antibodies that might bind to a different region of TNF. We're claiming the ones that bind to this particular region, which is a very successful invention. But as a matter of chemistry, it's going to look a lot different than A2, right? So it has to compete with A2, right? But it won't have a different structure. It may have a different amino acid structure, but the tertiary structure, the 3D structure, which is effective for this lock to fit the key, is going to have to be somewhat similar to fit into that same lock. And antibodies have a relevant 3D structure. That's described in the patent at columns 33 and 34. So it's a description of this three-dimensional structure when you talk about the lock and the key analogy and the fact that these antibodies that are claimed in this narrow class have to bind to the same or similar place as A2. And if I may, I'd like to bring this back down to the record because we've had a lot of talk here about scientific theory. But we are here from a jury verdict. And I invite you to look in the record to see exactly what was presented by Abbott in terms of written description. Their expert's opinion for why the patent allegedly didn't meet the written description part was based on two things. One, there was no specific example. And as I've argued, there's nothing in the law of this court or in the patent office guidelines that requires a particular amino acid sequence. And his other point was, and you didn't enable it. If you look through his discussion of his written description requirement, he goes on and on about, well, you couldn't make human antibodies. And that was rebuffed. That was his enablement opinion. It was rebutted. The jury rightfully disregarded his testimony because he was discredited time and again. The one part that they cite to in their reply brief, it's a one sentence from Dr. Marks at 18475 that they cite in truncated form in their reply brief where he says, we wouldn't be able to model the antibody from knowing the antigen. If you look at that in context of what he was saying, he was commenting on the affinity maturation section in our patent where it talks about, you know about the three-dimensional structure. You can make modifications and mutations of the amino acid sequence to improve the affinity. And he said, we didn't even know how to model TNF. So sure, we couldn't model the antigen base in the TNF. He was soundly discredited on that because TNF had been modeled. And on his cross-examination, it came out that not only had the three-dimensional structure of TNF been modeled and disclosed, it was cited in a publication right in the patent. Now, you said a moment ago, I think, and correct me if this is not what you said, but I thought you said that Dr. Marks testified that no one had made any form of fully human antibody. I thought it was at the 10 to the 8 affinity level. Is that right? I mean, I think you didn't add that. Right, right. Because his own paper, I take it, had 10 to the 6, 7. Right. In his enablement discussion, I was talking about his written description opinion. In his enablement opinion, he starts out, and on the very first page of that transcript, he's asked in three different ways, why isn't this enabling? And he says, because it doesn't disclose how to make human antibodies, period. Later on, when he's asked about, well, what's your opinion on undue experimentation? Then he does say, because there's nothing to disclose how to make a high affinity neutralizing antibody. And, of course, that would sound discredited as well. Now, am I correct? I threw it out, and I'm not sure it's right now that I think about it. Am I correct in saying that that 1993 paper did disclose a fully human antibody, but at a lower affinity level and below therapeutic level? Dr. Marsh testified that in 1991, he had made a human anti-TNF antibody with low affinity. He also testified, though, that in February of 1994, the Winter Lab, which was the lab from Cat, had made a higher affinity human anti-TNF antibody. But that's later than 1994. That's in February of 1994, and our priority date is February of 1994. But early February, right? February 4th? I don't know if the date is in the record. I think it was right at the beginning of February. Again, there's nothing in this record. We hear a lot about we need the amino acid sequence of the antibody. There's nothing in this record to suggest that the Patent Office guidelines and the longtime commentary from this court on those guidelines should be overturned. If that's going to be done, this is not the record to do it on, because there's no scientific basis to do so based on this record. I'd like to turn quickly to enablement, if I may. Your counsel talked about the Genentech case. There is enabling disclosure in the 775 patent, that the jury rightfully accepted. Dr. Graham, who was one of the inventors, painfully took the jury through the specification of the patent. He pointed them to the discussion in column 18 about how the variable region of a human antibody could be obtained. He referred to phage display. He explained how that could be used to get the human variable region of the antibody. Then he talked about the affinity maturation section in columns 33 and 34. He said this could be used to enhance the affinity even further. That is enabling disclosure that is in the patent. Now, there was a lot of other evidence that used to trial, much of it through cross-examining Abbott witnesses, that is supplementary to that and is very relevant because it goes to issues such as was undue experimentation required, how nascent was the artist, et cetera. But there was enabling disclosure in the patent as required by Genentech. This other evidence is very valid and very helpful. It supplements that. But the disclosure does meet the requirements of Genentech. So the argument that we just said, hey, it's all out there, is frankly not correct. So you think there's enough in the specification for one of our investigators down the road to be able to make or use the invention and enable them to do it? There is testimony from Dr. Graham that you could use what's in the patent to get the variable reach to the other side. I said he took X, undisputed took X, folks of ordinary skill in the art could not have done it. Mr. Lane has complied with it. He's obviously saying that there's undue experimentation required here because you require a real expert, not one of ordinary skill in the art, to be able to run the library, to be able to get to the end. Well, the evidence of that came in through Dr. Marks, who again was severely discredited. One of his bases for saying that undue experimentation was required, he said, well, we had to make a lot of innovation. We had to learn how to increase the size of these page display libraries. They were too small. Well, Dr. Southfield, their inventor, had said in his 1992 memo that the page display libraries that Cat had were of unprecedented size, 10 to the 23. I don't even know how you say that number, but that was how big their libraries were. That's undisputed. Dr. Marks' testimony on undue experimentation is just sadly discredited and the jury rightfully disregarded it. I'd like to close by just commenting on one last thing. This verdict got a lot of attention because of the size of the damages award, and that damages award was as large as it was because the infringing product, Humira, is as successful as it is. There were over $8.7 billion worth of infringing sales,  in view of those infringing sales. But all the issues we've discussed here today and that we discussed in the brief were hotly contested below. The jury was properly instructed. You haven't heard one word, one argument with the way the jury was instructed. They did their job. They did the right thing, and that should not be overturned. Thank you. Do we have a follow-up? Mr. Lee. Your Honor, I'll be brief, and let me address a couple points at the outset and go to the issue that was the focus of your questions, Ms. Eldrick, and which is what structure is disclosed in the patent? Because I think Judge Prost, it goes to your question of can you decide this as an issue of law? But let me hit a few points first. The case is not about overturning the PTO guidelines. The PTO guidelines were promulgated for the first time in 1999. That's five years after the priority date here. The question is what guidance do the PTO guidelines provide us in reaching the correct result as a matter of law here? And we suggest that the answer is none. Second point, on the article, the 1993 article, it is a low affinity antibody. It doesn't satisfy. A couple bars of magnitude below 10. That's exactly right. And on the only other document Ms. Eldrick mentioned, the Saalfeld Memo, which I think is at 2870 to 872, it's describing the work of people of extraordinary skill in the art, and the only antibody described in 871 is one that is non-neutralizing. So it doesn't satisfy the claims. Judge Clevenger asked whether the claim language can perform the written description function. And the answer is there's been some debate in the court about that. It doesn't matter here because this claim language wasn't in the 1994 specification or application. It wasn't added until 2002. That claim language they're relying upon to cover a fully human antibody wasn't there. So let me go to the written description issue and the question of what structure was disclosed. Because each of you asked Ms. Eldrick what structure was disclosed, and there were... Well, that's the simple answer to the A2 argument. Yes. And you've discussed and I've discussed with you the characterization of the antigen. Here are the simple answers to the A2 argument. The first is, if you read the claim limitation, it's functional. It's describing competitive inhibition. It couldn't be more functional. It's describing a result. But here's the second most important thing. The priority date we're talking about is 1994. As a result of that being the priority date, the Lee 1992 application was in the prior art as of 92. The competitive binding site of A2 was in the prior art. So there are two answers to their argument. The first is, the antigen was characterized by someone else and competitive inhibition of A2 is purely functional. The second is, whether it is or it isn't, that was in the prior art too for purposes of this case because 94 is the priority date. So if you take their argument based upon the PTO guidelines and you take their argument based upon Noel to its logical conclusion, this claim is invalid. Now, the truth of the matter is, all that's described is the characterization of the antigen and the crystal structure by someone else, 26 examples of a murine and chimeric antibody. There is no description of a structure by chemical formula, physical properties, or otherwise of the fully human antibody they now claim. At the end of the day... Could you mention an antibody described without a sequence? Your Honor, I think actually the best I can do in this sort of... I would say that you can't say, if you said flatly, you could never describe... You could describe silly putty even though you don't know the chemical formula. So there might be circumstances. I would say this. In 1994... I'm just pressing you to see whether you're standing on the real high. If you're really where you're at, you've got to have an example. The answer, I think, is in 1994, for a fully human antibody with these you should be able to have it. This is a lot like Chiron and the statement of this court at 363 FedSecond at 1255. And there basically the court said, well, it doesn't make any sense that you're claiming a chimeric antibody. Chimeric antibodies didn't exist at the time. And this goes to Judge Bryson's question. In 1994... And there is no dispute about this on the record. In 1994, no one anywhere on the face of the earth had a fully human antibody that was high affinity neutralizing of any kind to TNF-alpha. Not CENICOR, not us, not CHET. Also undisputed is lots of people had tried and they had failed. And those people had the same information in 1994 about the fully characterized antigen in A2, as CENICOR now says, describes their invention. And you would say, I take it to, like, further question you'd tell us, is there any reason to believe or to believe with confidence that there would be such an antibody discovered or that it even existed? And I take it your answer would be no. No. So your written description then becomes potentially a written description of an offset. That's exactly right. How can you have a written description that says to the one of ordinary skill in the art that you have possession of something that you don't even know exists, which is a point made in Chiron. And in fact, there are two fully human antibodies to TNF-alpha with the claimed characteristics. Ours resulting in our patent. And theirs, which they began working on in 1997 with a technology that didn't even exist in 1994. At the end of the day, we step back from all the details. We're almost there. Yes, we are. Well, at the end of this day, for sure. At the end of the day, the written description requirement has its groundings in the Supreme Court's 1854 decision in Morse. And the Supreme Court said, if you haven't invented and described it, you can't claim it. Centifort did not invent the fully human antibody. It's not a coincidence that they couldn't describe the structure by chemical formula otherwise. It's not a coincidence they couldn't enable it. I agree with Ms. Alderman, the number is big. It's a $2 billion jury verdict. And they've represented to the district court that they want $2 billion more for post-verdict damages. Should someone be able to recover that amount or any amount when they filed an application at a time when they did not have, could not claim,